# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SPEKTAR USA, LLC, | | No. 4:23-CV-00633 |
| Plaintiff, | | (Chief Judge Brann) |
| v. | | |
| TEAM PACKAGING, INC., | | |
| Defendant. | | |

## MEMORANDUM OPINION

### JUNE 25, 2025

This is a contract dispute between a seller and buyer of thermoforming plastic packaging film which involves breach of contract claims and counterclaims. The parties' business relationship broke down upon the delivery of a film shipment which had been produced by a different manufacturer and allegedly contained other nonconformities. Subsequently, several invoices were issued and went unpaid. The breakdown of an equipment purchasing arrangement led to various other claims. The Court grants summary judgment in part and denies it in part.

## I.     BACKGROUND

In April 2023, Plaintiff Spektar USA, LLC ("Spektar") filed an amended complaint against Defendant Team Packaging, Inc. ("Team").[1] The four-count amended complaint seeks relief against Team for Breach of Contract relating to

---

[1]     Amended Complaint, Doc. 3.

five unpaid invoices (Count I), Breach of Contract relating to an Equipment Purchasing Agreement (Count II), Conversion/Misappropriation relating to Team's possession of Spektar's MultiVac R230 Loaner Machine (Count III), and Unjust Enrichment generally (Count IV).[2] Team filed its Answer in June 2023.[3] The answer pled counterclaims against Spektar for Breach of Contract relating to nonconforming film (Counterclaim I) and Breach of Representations and Warranties regarding the MultiVac R230 Loaner Machine (Counterclaim II).[4] Spektar filed its answer in June 2023.[5] Also in June 2023, the parties docketed a Joint Case Management Plan which stipulated to limited facts.[6] Unsuccessful mediation attempts concluded in August 2024.[7] Following the close of discovery, Spektar moved for summary judgment on its claims and on Team's counterclaims in February 2025.[8] Team filed a brief in opposition in March 2025,[9] and Spektar never filed a Reply Brief. The motion is now ripe for disposition.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any

---

[2]    *Id.*
[3]    Answer with Counterclaim, Doc. 9.
[4]    *Id.*
[5]    Answer to Counterclaim, Doc. 15.
[6]    Case Management Plan, Doc. 14.
[7]    Report of Mediator, Doc. 28.
[8]    Motion for Summary Judgment, Doc. 35.
[9]    Brief in Opposition, Doc. 37.

material fact and the movant is entitled to judgment as a matter of law."[10] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[11] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[12] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[13]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[14] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[15] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the

---

[10]   Fed. R. Civ. P. 56(a).
[11]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[12]   *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).
[13]   *Id.*
[14]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).
[15]   *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

motion."[16] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[17]

A special note on affidavits, which seem to have garnered heavy reliance here. Although "more reliable forms of proof should be used in place of or to supplement an affidavit when that is possible and appropriate," the "use of affidavits rather than other forms of proof on a summary-judgment motion is left to the discretion of each of the parties."[18] But because of the shortcomings of relying on affidavits at summary judgment, Rule 56 sets out several limitations. Such affidavits must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

## III.    STATEMENT OF FACTS

This relatively simple contract dispute turns mainly upon the record, already pervaded by dozens of factual disputes and made more confusing by the parties' failure to provide adequate context. The parties did a poor job of setting out the record in this case.[19] Regardless, in its best effort to cobble together exactly what happened in this case and facilitate a just resolution of the merits of the underlying

---

[16]    Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[17]    Fed. R. Civ. P. 56(c)(3).

[18]    10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (4th ed. 2025).

[19]    If uncited materials reveal that the Court has misapprehended the record, that is the fault of the parties and not a ground for reconsideration.

legal claims here, the Court has expended significant time examining and re-examining the record. The facts in this case, resolving each genuine dispute of fact in favor of the non-movant, are as follows.

### A.    Background

This case involves several entities. The Plaintiff, Spektar USA, LLC, is a supplier of custom-made food packaging machines and made-to-order plastic packaging materials for the packaging of food, such as beef, chicken, seafood, cheese, and other items.[20] The Defendant, Team Packaging, Inc., was a customer of Spektar and a distributor of packaging machines and plastic materials.[21] Mike Anderson was previously the President of Team Packaging, Inc., and is now the President of Team Packaging, LLC,[22] and Adam Stankiewicz was a sales manager for Team Packaging, Inc. until October 2024.[23] ePak, LLC is an entity owned by Eric Pacyniak, Team's packaging and sales consultant, who along with Stankiewicz was an integral part of Team's internal team in maintaining and

---

[20]    Spektar's Statement of Facts ("SMF"), Doc. 36 ¶1; Team's Counter-Statement of Facts ("CSMF"), Doc. 38 ¶1; Amended Complaint, Doc. 3 ¶7; Answer, Doc. 9 ¶7.

[21]    SMF, Doc. 36 ¶2; CSMF, Doc. 38 ¶2.

[22]    *Id.* Team Packaging, LLC did not exist at the time of relevant conduct within this litigation but has assumed Team Packaging, Inc.'s liabilities. Anderson stopped operating Team Packaging, Inc. when Mike Anderson sold it to Shore Capital around April 2023, which operates a packaging arm known as Shore 360Pack. Anderson Deposition, Doc. 36-30 at 6:22-25, 7:16-8:17, 14:5-10. Shore 360Pack carried on the operations of Team Packaging, Inc., once Anderson formed a separate Team Packaging, LLC, and Anderson identified Shore 360Pack as Team Packaging, LLC's "renter." *Id.* at 21:2-14. 360Pack never assumed Team Packaging, Inc.'s liabilities, which were instead "carved out of it . . . in the sale" and passed on to Team Packaging, LLC. *Id.* at 21:15-24.

[23]    SMF, Doc. 36 ¶3; CSMF, Doc. 38 ¶3; Adam Stankiewicz Deposition, Doc. 36-2 at 6:15-21.

servicing its account with Mistica Foods, LLC ("Mistica"); while rendering these services to Team, Pacyniak served as a sales and technical representative for Team, and was authorized to work with Mistica on Team's behalf.[24]

Mistica was Team's customer and, while not a direct customer of Spektar's, was the end-user of some of the rolls of film Team purchased from Spektar during periods relevant to this litigation.[25] Colorado Food Enterprises is another customer of Team's.[26] Finally, Jayshri ProPak PVT. LTD. ("Jayshri") and Lahore Polypropylene Industries PVT, LTD ("Lahore") are two manufacturers that Spektar has worked with to manufacture made-to-order thermoforming plastic packaging materials and other materials for its customers.[27] Jayshri is owned by Ravi Hirpara.[28]

To recap: Jayshri and Lahore manufacture plastic packaging materials for Spektar; Spektar supplied those materials to Team; and Team works with ePak to distribute them to customers such as Mistica and Colorado Food Enterprises. With this groundwork in mind, the Court turns to several distinct contract disputes which have crystallized between the parties in this case.

---

[24]  SMF, Doc. 36 ¶¶5, 24; CSMF, Doc. 38 ¶¶5, 24.
[25]  SMF, Doc. 36 ¶¶4, 25; CSMF, Doc. 38 ¶¶4, 25.
[26]  Anderson Deposition, Doc. 36-30 at 16:15-24; SMF, Doc. 36 ¶103; CSMF, Doc. 28 ¶103.
[27]  SMF ¶6. Team's partial denial alleges irrelevant facts and does not provide any citation controverting this general description of Jayshri and Lahore as entities, so it tacitly admits this allegation. CSMF ¶6.
[28]  SMF, Doc. 36 ¶8; CSMF, Doc. 38 ¶8.

## B.    Issues Arise With September 12, 2022 Mistica Film Installment

In early 2021, Team contacted Spektar for sample trial rolls of film from Spektar's manufacturer, Jayshri, to be sent to Mistica for testing, which is "industry common practice and [was] customer[-]requested."[29] After testing and approval, Team began purchasing rolls of film from Spektar for resale to Mistica in the second quarter of 2021.[30] Spektar would offer products for sale according to Team's specifications, receive Purchase Orders from Team at an agreed-upon price, and accept them.[31] Spektar required Team to issue purchase orders before initiating the manufacturing process of custom-manufactured film to document Team's obligation to pay for the material ordered.[32] Spektar would have the material custom-manufactured by its supplier, Jayshri, in India, which would ship the film to Spektar's warehouse after manufacture.[33] Spektar would hold the material purchased by Team in its Pennsylvania warehouse until Team, by sending a Bill of Lading to Spektar, notified Spektar to release all or a portion of the purchased products.[34]

As a courtesy, Spektar would generally only invoice Team for the amount released and hold Team's remaining stock at its warehouse at no charge for up to

---

[29]    Stanciewicz Deposition, Doc. 36-2 at 13:1-11, 15:7-16:20.
[30]    SMF, Doc. 36 ¶51; CSMF, Doc. 38 ¶51.
[31]    SMF, Doc. 36 ¶¶51, 114; CSMF, Doc. 38 ¶¶51, 114.
[32]    SMF, Doc. ¶116; CSMF, Doc. ¶116.
[33]    SMF, Doc. 36 ¶52; CSMF, Doc. 38 ¶52.
[34]    SMF, Doc. 36 ¶¶53, 118; CSMF, Doc. 38 ¶¶53, 118

ninety days, to be picked up within that timeframe.[35] The parties would then arrange for a truck to pick up the material and ship it to either Team or directly to Team's customer Mistica.[36] The payment of each Spektar invoice to Team was Net 30 days from the invoice date.[37] From the second quarter of 2021 through July 11, 2022, Mistica's standard order from Team was 189 rolls of Spektar's JAQPA 125 – 5-mil film and 378 rolls of Spektar's JAQPA 250 – 10-mil film.[38] Team began invoicing Mistica for these orders in August 2021.[39]

The first dispute relates to several invoices for 5-mil and 10-mil film which Team ordered for its customer Mistica. On July 1, 2022, Team issued Purchase Order No. 1036919, for a total of $520,506.00 in plastic packaging materials.[40] Specifically, Purchase Order 1036919 requests six orders of 189 rolls of 407mm/5-mil JAQPA125 film and six orders of 378 rolls of 432mm/10-mil JAQPA225 film, and sets out six release dates for matching sets of film.[41]

On September 12, 2022, through Invoice No. 12031, Spektar invoiced Team for the first installment of Purchase Order 1036919: $94,857 for 207 rolls of 5-mil-

---

[35]  SMF, Doc. 36 ¶¶119-120; CSMF, Doc. 38 ¶¶119-120.
[36]  SMF, Doc. 36 ¶54; CSMF, Doc. 38 ¶54.
[37]  SMF, Doc. 36 ¶121; CSMF, Doc. 38 ¶121.
[38]  SMF, Doc. 36 ¶55; CSMF, Doc. 38 ¶55.
[39]  SMF, Doc. 36 ¶56; CSMF, Doc. 38 ¶56.
[40]  Case Management Plan, Doc. 14 ¶8.
[41]  TEAM 007, Doc. 36-37 at 2. The Purchase Order appears to contain a discrepancy in the item code, requesting "JAQPA 225" 10-mil film rather than "JAQPA 250" 10-mil film. The Court lacks the necessary context to understand the significance of this discrepancy and will consider these to be the same product.

thick, top non-forming film and 413 rolls of 10-mil thick, bottom forming film.[42] The invoice description of both rolls contains the code "JAQPA,"[43] which Stanciewicz states is "the nomenclature for Jayshri film."[44]

Team paid the invoice on or about September 28, 2022.[45] The goods subject to this invoice were shipped to Mistica on October 17, 2022.[46] In turn, Team invoiced Mistica $121,876 for all 413 rolls of the 10-mil film and 207 rolls of the 5-mil film, which Mistica paid.[47] But several problems were discovered once Mistica received the film rolls.

On November 1, 2022, Mike Anderson sent an email to ePak and Spektar reporting "serious issues" with the material, including that the cores "were not cleaned of labels for other products" and that because just under half of the 10-mil rolls were 430.5mm in width rather than 432mm in width, "[t]he film is coming out of the chains when they try to run the product."[48]

---

[42] SMF, Doc. 36 ¶ 14; CSMF, Doc. 38 ¶ 14 (failing to dispute this fact); TEAM 003, Doc. 36-33 at 1; Case Management Plan, Doc. 14 ¶9.

[43] TEAM 006, Doc. 36-33

[44] Team claimed that the JAQPA item number "is specific item number to Jayshri film" but failed to provide record evidence of this fact. CSMF, Doc. 38 ¶16.  But the Court has exercised its discretion to search the record and has found competent evidence to create a dispute of fact on this issue. *See* Adam Stanciewicz Deposition, Doc. 36-2 at 38:20-39:12; Anderson Deposition, Doc. 36-30 at 111:24-112:3.

[45] SMF, Doc. 36 14; CSMF, Doc. 38 ¶14; Anderson Affidavit, Doc. 39-4 ¶9.

[46] SMF, Doc. 36 ¶16; CSMF, Doc. 38 ¶16.

[47] SMF, Doc. 36 ¶39; CSMF, Doc. 38 ¶39.

[48] Email Chain re: Mistica Foods, dated November 1, 2022, through November 22, 2022 ("Mistica Email Chain"), Doc. 39-7 at 8-9.

Eric Pacyniak followed up, stating to Spektar owner and managing member James Wildonger that "this is a big problem" as "Mistica is struggling with this film and their quality department is very upset too."[49] Pacyniak highlighted similar issues, including that the film is "slightly too narrow, slip is much higher, the film is not forming as well, hazy is higher, overall appear is poor, cores are dirty (looks like mold), wrong core labels (BOPP), new core labels missing information."[50] Regarding the labeling issues, Pacyniak testified that a required "food safety protocol" is that "each roll of film is identified with an individual serial number that allows you to trace that film back to the resin that is used to produce it," but that these rolls lacked serial numbers and so "did not have all the required information for – for food safety."[51] As to the narrowness of the film, the target specification was for the film to measure at 432 mm, whereas the defective 10-mil film measured at 430 mm.[52] According to Pacyniak's testimony, Team also later realized that the web widths and slip levels of the film were wrong, too; "the web width was narrow, but it was very slippery, too."[53]

Wildonger responded with an explanation of what caused the various issues, stating that the film had not been cut to 432 mm because of a problem with the

---

[49]  *Id.* at 7.

[50]  *Id.* at 7-8.

[51]  Pacyniak Deposition, Doc. 36-11 at 70:7-71:4.

[52]  Mistica Email Chain, Doc. 39-7 at 7-8.

[53]  Pacyniak Deposition, Doc. 36-11 at 94:21-22, 112:1-47, 113:2-5; Anderson Affidavit, Doc. 39-4 ¶¶9-11 (explaining issues with film, including slip levels).

slitter, and that the "haziness" of the film was a result of it running on a faster line but that it would not affect performance.[54] Wildonger offered to ship "an older order of the material already slit to 432mm," but Pacyniak responded that "[w]e don't want to ship anything until we discuss and resolve a few issues with the material OH and any new extrusion runs for Mistica."[55] During a subsequent call, Team instructed Pacyniak to work with Mistica to try to get the nonconforming film to work with Mistica's machines before requesting replacement material.[56]

## C.    Crediting and Disposal of the Nonconforming Shipment

According to Eric Pacyniak, Mistica "did not want to run the material at all," but "we tried."[57] ePak tried to work with Team, Spektar, and Mistica to use this material, but because some of these rolls were two millimeters short, they "just couldn't get them into the chains . . . the way these machines operate," despite "maintenance involvement" to attempt to use the material.[58] As a result of Pacyniak's efforts to work with Mistica to get the nonconforming film to work, "a lot of downtime for 8-9 machines at three of Mistica's plants" resulted.[59] On November 17, Pacyniak ultimately followed up that despite working with Mistica

---

[54]   *Id.*
[55]   *Id.* at 6-7.
[56]   SMF, Doc. 36 ¶¶21, 26; CSMF, Doc. 38 ¶¶21, 26.
[57]   Pacyniak Deposition, Doc. 36-11 at 94:5-19.
[58]   *Id.* at 94:13-95:1.
[59]   SMF, Doc. 36 ¶27; CSMF, Doc. 38 ¶27.

to use up the film from this delivery, "the problems are getting worse" because "there is no way to tell if a roll is good or bad until it[']s on the machine."[60]

Pacyniak therefore relayed that Mistica wanted the remaining inventory "picked up and credited," which consisted of all the 5-mil rolls and 189 remaining 10-mil rolls.[61] Adam Stanciewicz, Team's Sales Manager, followed up and asked whether Spektar could arrange for the bad rolls of film to be picked up from Mistica.[62] Stanciewicz also referenced a "previous call last week" in which Spektar representatives "said that [they] have film in inventory that is straight from Jay Shiri and was not slit down here in the states," and asked Spektar to "confirm and send us the roll tags showing this as well as pictures showing what the web widths are for both top and bottom film. We will not be able to receive in anything that is not to spec and also with the original core tag and labels. Please advise ASAP. . . ."[63] Apparently, this confirmation was never sent.[64] And despite this request for confirmation that any replacement film come from Jayshri, at no point in this email chain did Wildonger indicate that the problems with this shipment had been caused by Spektar using a different manufacturer, nor, according to Mike Anderson, did Wildonger otherwise do so.[65]

---

[60]  Mistica Email Chain, Doc. 39-7 at 5.
[61]  *Id.* at 5.
[62]  *Id.* at 5.
[63]  *Id.* at 4.
[64]  Stanciewicz Deposition, Doc. 46-2 at 28:8-29:1-3. Also, Spektar's final offer on November 2022 did not mention or provide any such confirmation.
[65]  Mike Anderson Affidavit and Declaration, Doc. 39-4 ¶¶10, 13.

"After all this happened," Anderson viewed the picture Pacyniak had taken of this shipment, noticed that it had been labeled with "Lahore Polypropylene, BOPP," and searched for the manufacturer online, which caused him to realize that it had not been manufactured by Jayshri.[66] Spektar does not dispute that this shipment was manufactured by Lahore but instead contends, as will be discussed below, that Team approved this change in manufacturers.

Spektar President Mike Anderson then coordinated a pickup date of November 22 for the film with Pacyniak and Wildonger, asking whether the 5-mil film was usable and stating "[i]f not . . . all of it needs to go back to Spektar. I highly doubt they want to use that film with their other supplier."[67] During this discussion, Pacyniak stated that because "Mistica runs matched films from each supplier," "[q]uality doesn't like mixing suppliers because if they get leakers during cook it[']s difficult to define what happen[ed]."[68] According to Pacyniak, "the standard policy for any food manufacturer" is "not to mix and match top and bottom films" from different manufacturers.[69]

---

[66]  Affidavit and Declaration of Mike Anderson ("Anderson Affidavit"), Doc. 39-4 ¶15; Anderson Deposition, Doc. 36-30 at 112:4-13. The lack of clarity regarding timing is unfortunate. Nevertheless, the Mistica Email Chain could be read to suggest that Team became aware of these rolls being manufactured by Lahore sometime between November 1, 2022, and November 17, 2022, when Team requested Spektar to "confirm and send us the roll tags showing" that any replacement film would be manufactured by Jayshri. Mistica Email Chain, Doc. 39-7. The email is far from clear, however—Anderson might also have discovered this later on.

[67]  Mistica Email Chain, Doc. 39-7 at 3.

[68]  *Id.* at 2.

[69]  Pacyniak Deposition, Doc. 36-11 at 59:1-10.

Attempts to arrange replacement film broke down at this point. Wildonger responded to Pacyniak's email by stating that Spektar had only agreed to return the 10-mil forming film and to ship a new run of the 432mm 10-mil film to Mistica, and that if Team did not agree, "you guys can arrange the shipment of all materials to Team Packaging's warehouse, which Spektar will not credit back any of the freight cost."[70] Ultimately, Spektar was willing to take back the Mistica inventory of 189 rolls of the 10-mil film, but not the remaining 5-mil film.[71]

Spektar refused to pick up or accept the 5-mil film and never ultimately accepted or picked up the remaining 10-mil film. The parties now contest what happened to this product and whether Mistica received, or was credited for, the 5-mil rolls. Team signed a sworn statement in this case that it "credited Mistica back for all of these rolls."[72] Spektar partially contests this response and argues that "Team only credited Mistica for 189 rolls of the 10 mil film ($37,711), not any of the 5 mil film," because "Mistica approved the release of that [5-mil] film" and ultimately "dispatched 162 of the 5-mil rolls to Mistica."[73] The parties also continue to contest the quality of the 5-mil rolls.

---

[70]    Mistica Email Chain, Doc. 39-7 at 2.
[71]    SMF, Doc. 36 ¶31; CSMF, Doc. 38 ¶31.
[72]    Pacyniak Deposition, Doc. 36-11 at 87:5-88:2; SMF, Doc. 36 ¶40; CSMF, Doc. 38 ¶40.
[73]    SMF, Doc. 36 ¶¶35, 41-43.

Spektar first points to a Team credit memo issued on November 30, 2022, which only credits Mistica for 189 10-mil rolls, and none of the 5-mil rolls.[74] Next, Spektar points to an email sent from Pacyniak to Mistica employees in January 2023, in which Pacyniak stated that there was "nothing wrong with" the 5-mil film and continued: "[l]ooking to ship these rolls from Team, along with 400 rolls of P1154 [10-mil film] from Charter."[75] Pacyniak stated in deposition that while the 5-mil film still had a "labeling problem," and using it would require mixing it with films from Mistica's other manufacturer, Charter, he had described the 5-mil film as "good" in his email because it was "within spec" unlike the narrow 10-mil film.[76] Pacyniak explained that he was trying to "help the situation and not have the material thrown away or not be able to be used and try to get the customer to use this up on behalf of Spektar . . . the rolls were not labeled properly, and this was an inquiry to them to see if they would use it."[77] "[W]e were trying to work through this, and we were asking them if they would be comfortable using different top and bottom films, because this is not something normally that is done."[78] The email chain concludes with Pacyniak and the Mistica employee scheduling the release of this material for January 18, 2023.[79] Pacyniak states in his

---

[74] P19, Doc. 36-27; TEAM 0003, Doc. 36-33.
[75] P15, Doc. 36-23.
[76] Pacyniak Deposition, Doc. 36-11 at 82:6-84:13.
[77] *Id.*
[78] *Id.* at 78:16-20.
[79] P17, Doc. 36-25.

deposition that he "can't remember" whether the January 18 release of this material actually occurred and that he is in possession of no other e-mails discussing the transfer of this material.[80]

Spektar also points to the April 2023 email chain between Pacyniak and Mistica personnel in which Pacyniak, describing a new purchase order, states: "Please note these rolls are from a return back in Nov/Dec. We returned P1153 [5-mil] and P1154 [10-mil], however only P1154 was bad. Nothing wrong with P1153. A credit was only issue[d] on P1154, so there will be no invoice for these for these 6 pallets (162 rolls) of P1153 you received today."[81] However, while the email references the defective 10-mil film obtained from Spektar, it is unclear whether the 5-mil Spektar film referenced in the email is the specific Lahore product disputed in this case or different shipment of 5-mil film, and Pacyniak stated in his deposition that he could not recall.[82] Pacyniak also states in his subsequent deposition testimony that the 5-mil material may have been "reworked" by Team to fix the labeling problems because he was "being told that the material is fine," but does not know what happened to it; "it got taken away by Team, and I was told that it was inspected, reworked, and they wanted to ship it back."[83] Pacyniak stated that it appeared from this email chain that "these rolls would be

---

[80]   Pacyniak Deposition, Doc. 36-11 at 87:5-88:2.
[81]   P18, Doc. 36-48.
[82]   *Id.*; Pacyniak Deposition, Doc. 36-11 at 86:18-87:16.
[83]   Pacyniak Deposition, Doc. 36-11 at 84:7-87:16; 89:4-7.

coming back without a new invoice," but he ultimately maintained that whether Mistica was credited for the 5-mil shipment was an accounting matter outside of his personal knowledge.[84]

Team, on the other hand, points to Mike Anderson's deposition testimony that he "thought that we issued them [Mistica] a full credit;" but Anderson admits that he could not remember whether any other pertinent credit memos existed, despite Spektar's discovery request for all such memos.[85] When Anderson is directly asked about the potential "reworking" of the 5-mil film referenced by Pacyniak's deposition testimony he states that this film was "[p]ut in storage racks" in Team's Aurora warehouse, that no documents exist showing that it was reworked and shipped back to Mistica, and that Team did not produce any such documents in discovery.[86] Anderson also agrees that Pacyniak "requested" that these rolls would be shipped to Mistica, but states that "[i]t never got shipped . . . [h]e never got okay from Mistica to ship it."[87] Anderson further stated that "[t]here was no way to make 5-mil film that's 407."[88] Anderson's subsequent affidavit is

---

[84]  *Id.* at 91:16-92:10.
[85]  Anderson stuck to his claim that Mistica received a full credit despite extensive and repeated badgering during his deposition. Anderson Deposition, Doc. 36-30 at 16:21-27:23, 31:16-32:20-35:15.
[86]  *Id.* at 124:1-6; SMF, Doc. 36 ¶44; CSMF, Doc. 38 ¶44 ("No documents exist regarding any alleged 'reworking,' therefore none could be produced.").
[87]  Anderson Deposition, Doc. 36-30 at 35:16-40:8 (Anderson continuing to state that this material was never released to Mistica).
[88]  Anderson Deposition, Doc. 36-30 at 124:1-6. No party attempts to explain precisely what this means—presumably "407" relates to the measurement specifications of the 5-mil film being discussed.

firmer on the question of crediting: he states that "Team Packing credited Mistica for the entire order" and that Team never resold this 5-mil film back to Mistica after Team obtained it from Mistica.[89]

Team states in an interrogatory, and Anderson states in his deposition, that after Team paid the freight costs of transporting the remaining film to Chicago and ultimately back to Team's Aurora, Colorado warehouse, Spektar refused to take this film back or pay to ship it back.[90] Team's interrogatory therefore states that while it currently has 39 rolls of the 5-mil JAQPA125 407mm film in its warehouse, the remainder of that film, and all of the 10-mil JAQPA225 432 mm film, was "disposed of" in July 2023 due to Spektar refusing to take it back.[91] Likewise, Anderson states in his deposition that what remains of the 5-mil film is "probably" in Team's Aurora warehouse, but that aside from the 39 rolls remaining in Team's inventory, "[s]ome of it may have been disposed of . . . '[d]isposed of' means throwing in the trash."[92]

On this record, Team has created genuine disputes regarding both the reworking and crediting of the 5-mil film.[93] Anderson's statements that Team threw out the remaining 5-mil film, that Team would not "rework" film, and that

---

[89] Anderson Affidavit, Doc. 39-4 at ¶¶14, 18.
[90] Team's Interrogatory Response, Doc. 39-10 ¶13.
[91] *Id.*
[92] Anderson Deposition, Doc. 36-30 at 28:12-29:2, 39:22-40:5.
[93] To discard Team's version of events, the Court would have to conclude that it is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). This record, perhaps narrowly, falls short of reaching that standard.

Team credited Mistica back, are sufficient to place this issue in dispute.[94] The Team credit memo along with Pacyniak's testimony and emails to Mistica personnel are not so decisive upon this question that they blatantly contradict Anderson's testimony. A reasonable jury could conclude based on Anderson's countervailing testimony that Pacyniak's plan to "rework" the 5-mil film was never followed through on and that the Team credit memo does not rule out the existence of other crediting agreements, even agreements relating to the same film referenced in the original credit memo.[95] In finding a genuine dispute here, I note that Spektar did not elicit any testimony from personnel associated with Mistica to determine whether Mistica ultimately received "reworked" 5-mil film or was credited for it.

Team eventually lost Mistica's business.[96] On January 30, 2023, Team reported to Spektar that it intended to send the Jayshri-sourced film and Lahore-sourced film to an independent lab for testing and comparison, but it never did due to the expense involved.[97]

---

[94] Spektar never attempted to invoke the sham affidavit doctrine, so I do not address it here.

[95] It also leaves open the possibility that Team simply provided a shipment of 5-mil film to Mistica at no cost once it became clear that no "reworking" would occur, instead of formally crediting Mistica.

[96] *See* Anderson Deposition, Doc. 36-30 at 42:4-43:13.

[97] SMF, Doc. 36 ¶78; CSMF, Doc. 38 ¶78; Anderson Deposition, Doc. 36-30 at 76:2-17.

### D.    Disputed Approval of Lahore Manufacturing Film for the Nonconforming Shipment of Film

Price increases from Team's preferred manufacturer Jayshri in 2021 and 2022, and corresponding price increases in Team's invoices to Mistica in April, May, and June 2022, led to Team requesting Spektar to explore lower-priced sample rolls of other film for testing and approval.[98] Spektar's primary rebuttal to Team's protests is that Team actually did approve the Lahore film.

According to Pacyniak, standard practice is to receive test rolls where "any type of change," such as a change in manufacturers, occurs.[99] Anderson, who plans to testify as an industry expert based on his status as Team President, likewise states that when "a supplier decides to change manufacturers, it is common industry standard to send test rolls to the customer first . . . [and] send[] a letter of guarantee regarding the new manufacturer."[100]

Spektar points to test film that was arranged to be shipped in mid-2022 to argue that Team approved the use of Lahore, or at least non-Jayshri, film.[101] A May 30, 2022 email from Spektar President James Wildonger, which advises Team that Spektar had secured a delay on Jayshri's 8% price increase "for the next couple of containers for Mistica," states: "I have another option . . . to use a faster line that [Spektar had] tested . . . we can produce at a slightly better cost/ roll using the

---

[98]  SMF, Doc. 36 ¶¶49, 57-59, 61; CSMF, Doc. 38 ¶¶49, 57-59, 61.
[99]  Pacyniak Deposition, Doc. 36-11 at 115:8-116:10
[100]  Mike Anderson Affidavit, Doc. 39-4 ¶16.
[101]  SMF, Doc. 36 ¶¶46, 50, 65.

same structure of PA/PE . . ."[102] Three subsequent emails from July and August 2022 reference the shipment of 5-mm and 10-mm JAQPA "trial film" to Pacyniak.[103] Wildonger sent a text message to Stanciewicz in August 2022 asking whether he had the results to the test rolls, to which Stanciewicz replied: "Yes approved."[104] Stanciewicz testified that this referred to approval by Mistica and Pacyniak.[105] According to Wildonger's affidavit, he believed that "[t]his text message is Team's approval of the new film that Spektar was sourcing from Lahore."[106]

Team maintains that this test roll shipment had nothing to do with the contested Lahore film in this case. Stanciewicz stated in his deposition that he did not read Wildonger's proposal to refer to a different supplier.[107] Pacyniak testifies that "these samples had to do with testing film that ran on a different machine at Jayshri," but not from any alternative manufacturer for testing with Mistica's machines, in July 2022.[108] Pacyniak and Anderson state that no testing occurred for any switch to the contested Lahore film which was contained in the October 2022

---

[102] SMF, Doc. 36 ¶¶62-64; CSMF, Doc. 38 ¶¶62-64.

[103] P6; P7; P11; SMF ¶¶67-68; CSMF ¶¶67-68. The parties also dispute whether Pacyniak ever received this shipment. SMF, Doc. 36 ¶69; CSMF, Doc. 38 ¶69. But that dispute is not material to this case because, as explained below, Team has created a dispute of fact to support its assertion that this test film was from Jayshri rather than Lahore and was unrelated to the contested nonconforming shipment at issue in this case.

[104] SMF, Doc. 36 ¶¶70, 73; CSMF, Doc. 38 ¶¶70, 73; P8, Doc. 36-15.

[105] Stanciewicz Deposition, Doc. 36-2 at 59:7-20.

[106] Wildonger Declaration, Doc. 36-57 ¶22.

[107] Stanciewicz Deposition, Doc. 47:10-48:2.

[108] CSMF, Doc. 38 ¶65; Pacyniak Deposition, Doc. 36-11 at 32:3-33:14; 44:24-45:8.

shipment to Mistica, and that they were not aware of any Lahore film being tested, much less approved, at any point.[109] They also maintain that no agreement exists between Team and Spektar to use Lahore, nor was Team supplied with any letter of guarantee regarding Lahore products, and if such documents exist, Spektar has failed to cite them.[110] According to Team's interrogatory response: "Jayshri was the only film [] tested and approved for use at Mistica. During all conversations with Spektar . . . the parties discussed that Jayshri film was the only film Spektar ever provided for testing at Mistica . . . Spektar never provided any other brand of film."[111]

On this record, a reasonable jury could credit Team's understanding that these documents related to the testing of unrelated Jayshri film. Team has therefore created a genuine dispute in support of its version of events: that it tested new rolls of film from other lines at Jayshri, but never tested new rolls of film from Lahore.

### E.    Equipment Purchase Agreement and Loaner Machine

Another dispute in this case involves two interrelated agreements for Spektar to provide a TEPRO food packaging machine to Team for purchase by its client Colorado Food Enterprises, and to loan Colorado Food Enterprises a Multivac R230 Loaner Machine in the interim. Ultimately, a dispute arose concerning the

---

[109]  Pacyniak Deposition, Doc. 36-11 at 116:5-10; Anderson Affidavit, Doc. 39-4 at ¶¶16-17.
[110]  Anderson Deposition, Doc. 36-30 AT 113:18-23; Anderson Affidavit, Doc. 39-4 ¶¶16-17.
[111]  Team Interrogatory Response, Doc. 39-10 ¶15.

Loaner Machine's functionality, and Team never followed through on the agreement to pay for the TEPRO Machine.

### 1.    The Underlying Agreements

In June 2021, Spektar and Team signed an Equipment Purchase Agreement (the "EPA").[112] The EPA sets out equipment to be sold from Spektar to Team, an "LPP420x30M that includes flexible tooling and top and bottom labelers," referred to by the parties as a "TEPRO machine," for $163,029.00.[113] The EPA states in Exhibit B that Team shall submit a Purchase Order for enough film to cover 90 days of projected production within 10 days of the Agreement's Effective Date and that the film used for this machine by Team's client Colorado Food Enterprises shall be obtained through Spektar.[114] Exhibit B further sets out a payment regime for the TEPRO, explaining that Team will pay an upcharge of $45.00 per roll of film to be applied against the purchase price until the TEPRO has been paid off.[115] The EPA also provides that where the amount of money collected from upcharges does not exceed a monthly minimum payment of $4,529, Team will pay the

---

[112]  SMF, Doc. 36 ¶89; CSMF, Doc. 38 ¶89; Team 0011, Doc. 36-41.
[113]  Team 0011, Doc. 36-41 at 1-2, 7.
[114]  *Id.* at 8.
[115]  *Id.*; *see also* Anderson Deposition, Doc. 36-30 at 72:8-73:10 (explaining that the money "was going to be collected by the use and sale of additional roll stock film" to Team's customer Colorado Food Enterprises "because that's what they were previously buying from us, and this machine was going to use that same exact film . . . at the end of 30 days every month, we were going to send a check to Spektar for the amount of film that had been used at Colorado Food Enterprises); SMF, Doc. 36 ¶91; CSMF, Doc. 38 ¶91.

balance of that amount for the month which will be applied to the balance of the TEPRO cost.[116]

While the EPA was being negotiated, Spektar and Team were also negotiating a "loaner machine" agreement to provide a Multivac R230 to Colorado Food Enterprises through Team.[117] Wildonger and Anderson both testified that the purpose of providing Colorado Food Enterprises with the Loaner Machine was to help it pay the cost of the new TEPRO machine while using the upcharged film.[118]

Neither party has provided any written version of the Loaner Agreement and Team stated it was not in possession of any related documents, with the exception of one email; nor have the parties attempted to articulate whether the agreement was written or oral.[119] Wildonger offers to provide two machines in an email chain to Anderson and Stanciewicz in March 2021, stating that the R230 "would be offered at no cost with new order for a Tepro;" he also states, "[w]arranty is the

---

[116] *Id.*

[117] SMF, Doc. 36 ¶99; CSMF, Doc. 38 ¶99.

[118] *See* Wildonger Declaration, Doc. 36-57 at 88:17-22 (describing the Loaner Machine as "a machine that was under a machine purchasing agreement of a new piece of equipment that was communicated that would help their customer, CFE, to increase their capacity prior to receiving the new machine"); Anderson Deposition, Doc. 36-30 at 70:9-71:17; Anderson Affidavit, Doc. 39-4 ¶20 ("we agreed that Spektar would provide us a fully functional loaner machine that our customer could use. Our customer would then buy film for this machine at an increased price per roll to proactively finance the purchase of the TEPRO machine").

[119] TEAM 0017, ¶¶35-38.

entire length of the material contract of non-wearable parts."[120] Anderson states "I'm in!" and asks Wildonger to "go through this" in a call with Stanciewicz.[121]

In part of an email which appears to simply be pasted into the end of the EPA itself without context, Anderson stated that the cost of the TEPRO would be collected through an upcharge on Colorado Food Enterprises' film costs and would conclude roughly within 16-18 months.[122] The text further states: "they will be doubling their film usage with a second machine and this may be paid off sooner," presumably referring to the Loaner Machine.[123]

The EPA was signed by Team on June 22, 2021, and signed by Spektar on June 24, 2021; it states that it commences upon the effective date of June 22.[124] In his deposition, Anderson states that Team's general practice was to issue a purchase order and provide a 50% deposit after working with the end customer to finalize manufacture timing, import, delivery, and financial terms.[125] In this case, however, the TEPRO machine was custom manufactured for Team after the parties signed the EPA, but before Team provided a purchase order.[126]

---

[120] TEAM 0012, Doc. 36-42.

[121] *Id.*

[122] TEAM 0011, Doc. 36-41 at 15. This appears to be text from an email response to the initial EPA offer sent by Wildonger on June 22, 2021, but this is not made clear from the record.

[123] *Id.*

[124] SMF, Doc. 36 ¶92; CSMF, Doc. 38 ¶92.

[125] Anderson Affidavit, Doc. 39-4 ¶19; Anderson Deposition, Doc. 36-30 at 71:15-72:4.

[126] SMF, Doc. 36 ¶98; CSMF, Doc. 38 ¶98. The parties failed to provide the Court with any information about when the TEPRO machine was manufactured.

## 2.    Breakdown of Agreements During Performance

Team arranged for pickup of the Loaner Machine at Spektar's facility on November 18, 2021,[127] and paid Spektar's invoice for the Loaner Machine's shipping and installation costs at Colorado Food Enterprises as well as two Multivac R230 Die Sets.[128]

The Loaner Machine was not operational when it was delivered.[129] Spektar sent a technician who showed up to Colorado Food Enterprises to fix the machine.[130] The technician's Service Call Report, according to Wildonger's undisputed testimony, reflects the technician's three hours of adjustments on the machine.[131] Team paid an invoice for those services.[132] But Anderson testified that Spektar's "tech was in and out [and] was on a tight timeline" because the facility was undergoing an audit that day, and so the technician "[c]ould not get the time to get the machine up and running correctly," the result being that the Loaner Machine was not fully functional despite the technician's efforts.[133]

Colorado Food Enterprises, according to Anderson, worked on the broken loaner machine "probably seven to ten working days to get it up and running."[134] "When they could not" get the machine up and running, Team "went back over

---

[127]  SMF, Doc. 36 ¶99; CSMF, Doc. 38 ¶99.
[128]  SMF, Doc. 36 ¶¶100-101; CSMF, Doc. 38 ¶¶100-102.
[129]  Anderson Deposition, Doc. 36-30 at 80:10-19, 100:8-9; Anderson Affidavit, Doc. 39-4 ¶21.
[130]  SMF, Doc. 36 ¶106; CSMF, Doc. 38 ¶106.
[131]  SMF, Doc. 36 ¶108; CSMF, Doc. 38 ¶108; Wildonger Declaration, Doc. 36-57 ¶35.
[132]  SMF, Doc. 36 ¶107; CSMF, Doc. 38 ¶107.
[133]  Anderson Deposition, Doc. 36-30 at 81:7-9; Anderson Affidavit, Doc. 39-4 ¶21.
[134]  Anderson Deposition, Doc. 36-30 at 100:10-12.

there" and "offered to bring the machine back because they couldn't use it in their facility at that time."[135] Team ultimately delivered the machine to its technicians' shop, where the technicians "probably worked on it for two, three weeks."[136] Anderson further testified that Team bore over $20,000 in costs for these repairs.[137]

Team ultimately never returned the Multivac R230 Machine and it is currently in the possession of Colorado Food Enterprises.[138] According to Anderson's Deposition and Affidavit, Wildonger refused to pick up the machine, stated in an unproduced email that he did not want it back "on the premise that he had to pay for the expenses to get it up and running, which [Team] had already paid," and so ultimately requested only $8,000 for the machine, which Team paid.[139] Wildonger, on the other hand, states in his Declaration that "Spektar's financial records do not reflect payment of the $8,000 Invoice No. 11953 for the Loaner Machine."[140] These dueling testimonies create a genuine dispute for purposes of summary judgment.

---

[135] *Id.* at 100:13-16.

[136] *Id.* at 100:17-101:1.

[137] *Id.* at 102:2-14.

[138] SMF, Doc. 36 ¶103; CSMF, Doc. 38 ¶103.

[139] Anderson Deposition, Doc. 36-30 at 18:20-19:1, 80:1-22, 99:3-8, 101:13-16; Anderson Affidavit, Doc. 38-4 ¶21.

[140] Wildonger Declaration, Doc. 36-57 ¶34. Spektar failed to support this fact in its SMF. SMF, Doc. 36 ¶¶104-105. Failing to support this allegation violates this Court's local rules and the Court is within its discretion to conclude that Spektar has not created any dispute of fact. *See Webb*, 2023 U.S. Dist. LEXIS 230328, at *4-5. But the Court has exercised its discretion to search the record for this evidence. I also note that Spektar provided this citation in its Brief in Support. Motion for Summary Judgment, Doc. 35 at 37.

Following these issues with Spektar's Loaner Machine, Team never issued purchase orders or accepted delivery of the TEPRO machine referenced in the EPA, and refused to accept delivery even when Spektar advised Team that the TEPRO machine was fully built and operational and available in Poland for shipment.[141]

### F.    Unpaid Invoices

Spektar now describes five invoices which it alleges were never paid: Invoice Nos. 12035, 12395, 12089, 11734, 11735. Spektar and Team agree that Spektar issued these invoices to Team and Team did not pay them.[142] Team also does not appear to dispute the contents of these Purchase Orders.[143] Following the dispute between Team and Spektar over the nonconforming shipment, Anderson stated to Team in a January 18, 2023 email that "we are withholding all payments to Spektar."[144] Team states that because Spektar has refused to credit it back for the disputed $94,857.00 Lahore shipment to Mistica associated with Invoice No.

---

[141] SMF, Doc. 36 ¶¶90, 97; CSMF, Doc. 38 ¶¶90, 97 (failing to create any dispute as to this fact); Wildonger Declaration, Doc. 36-57 ¶32.

[142] SMF, Doc. 36 ¶127; CSMF, Doc. 38 ¶127.

[143] SMF ¶124; CSMF ¶124. Spektar also states that "[n]one of Team's Purchase Orders require Spektar to use a particular manufacturer." SMF ¶126. However, the disputes of fact described above regarding the industry practice of approving any change in manufacturers, together with Anderson's deposition and affidavit testimony that Mistica's order was always only for Jayshri film and no agreement existed between Team and Spektar to sue Lahore, effectively dispute this fact. *See* CSMF ¶126; Anderson Affidavit ¶¶7, 17; Anderson Deposition at 113:18-23.

[144] Amended Complaint, Doc. 3 ¶66; Answer to Amended Complaint, Doc. 9 ¶66.

12031, it has "withheld payment on other outstanding invoices . . . which were far less in total dollars than what we paid under Invoice No. 12031."[145]

### 1.    Invoice Nos. 11734 and 11735: Shipping for P.O. 1035183

In October 2021, Team Issued Purchase Order No. 1035183.[146] Invoice Nos. 11734 and 11735, billed in May 2022,[147] are shipping charges relating to this Purchase Order and Team agrees that it never paid these invoices and that the delivery was made.[148]  Purchase Order No. 1035183 is not in the record.

### 2.    Invoice No. 12035: The Second Installment of P.O. 1036919

Invoice No. 12035, which was the second installment of Purchase Order 1036919, was billed to Team on September 26, 2022 in the amount of $57,711.00 for 105 rolls of JAQPA125 407mm/5-mil film and 271 rolls of JAQPA250 432mm/10-mil film.[149] This date—September 26, 2022—was about two weeks after Spektar's September 12 invoice for the nonconforming Lahore shipment to Mistica described above (the first installment of this Purchase Order), and just over a month before Team sent its November 1, 2022 email to Spektar regarding the

---

[145] Team Interrogatory Responses, Doc. 39-10 ¶7.

[146] Amended Complaint, Doc. 3 ¶19; Answer, Doc. 9 ¶19. Team claims in its answer that "Spektar made mistakes in fulfilling this Order" and that "the amounts are not due because the charges were based upon corrective measures that were necessary due to Spektar's mistake in misprinting bags." Answer, Doc. 9 ¶¶19, 21, 23. Yet Team failed to provide *any* record materials supporting this claim for summary judgment purposes, either in its counter-statement of material facts or in its briefing; it is therefore not in dispute.

[147] *See* Amended Complaint, Doc. 3 ¶¶21, 23; Exhibit A, Invoice, Doc. 1-2; Exhibit B, Invoice, Doc. 1-3.

[148] SMF, Doc. 36 ¶113; CSMF, Doc. 38 ¶113; Amended Complaint, Doc. 3 ¶20; Answer, Doc. 9 ¶20.

[149] TEAM 007, Doc. 36-37 at 1.

issues with this earlier shipment.[150] Team admits that it placed the Purchase Order resulting in this invoice and there is no dispute of fact that Team refused to pick or pay for the product associated with it.[151] In his deposition, Anderson contends that Invoice No. 12035 billed Team for the incorrect quantities of these products and that this was "not authorized to ship at that time."[152]

### 3.    Invoice No. 12089: P.O. 1037600

Invoice No. 12089 was billed to Team by Spektar on October 17, 2022 in the amount of $31,320.00 for 18 rolls of JAQEZP100 405mm/609m film and 162 rolls of JAQ225 423mm/305M-9-Mil film.[153] It relates to Purchase Order No. 1037600,[154] which Team admits it issued and which Team admits requested these same items.[155] Based on a bill of lading recording shipment to Team on October 14, 2022 and the declaration of James Wildonger, Spektar contends that it "delivered the products listed on Invoice No. 12089, but Team did not pay the invoice."[156] Team only states in response that it cannot confirm whether these

---

[150] TEAM 007, Doc. 36-37; TEAM 003, Doc. 36-33; Mistica Email Chain, Doc. 39-7.

[151] CSMF ¶111; Case Management Plan, Doc. 14 ¶¶11-12. Team states that it "denies that [it] did not pay for these orders." CSMF ¶111. But Team cites no evidence in support of this fact and the substance of its denial provides a justification for nonpayment, rather than evidence of payment itself. So the fact of nonpayment is admitted for purposes of this motion. Likewise, Team's denials to the fact that Spektar manufactured the materials for invoices 12035 and 12395 and stores them in its warehouse merely rely on its lack of knowledge as to these facts, and they have not created a dispute here either. SMF ¶¶128-129; CSMF ¶¶128-129.

[152] Anderson Deposition, Doc. 36-30 at 60:11-19, 61:16-20.

[153] TEAM 009, Doc. 36-39.

[154] *Id.*

[155] Amended Complaint, Doc. 3 ¶52; Answer, Doc. 9 ¶52.

[156] SMF, Doc. 36 ¶112; TEAM 009, Doc. 36-39 at 2; Wildonger Declaration, Doc. 36-57 ¶38.

products were delivered and cites to a paragraph in Mike Anderson's affidavit which states generally that Team never received test rolls or notice for Lahore film.[157] This is insufficient to create a genuine dispute of fact as to whether Team paid this particular invoice or accepted this particular shipment. Moreover, Team admits in its answer that it took delivery of this order.[158]

### 4.  Invoice No. 12395: Multiple Blanket P.O.s

Invoice No. 12395, which followed on April 11, 2023, bills Team for all the remaining inventory which Team never picked up or paid for in the amount of $64,546.77.[159] The Invoice states as its purchase order "Multiple Blanket PO#'s."[160] Although Spektar never specifies which Purchase Orders resulted in this invoice and never provides those Purchase orders, Team admitted that it placed the various Purchase Orders resulting in this invoice.[161] When questioned, Anderson stated that he believed that some of these items contained errors because they were misprinted, and identified the seventh and eighth entries in this invoice, but admitted that he could not completely recall what other aspects of Invoice No.

---

[157] CSMF, Doc. 38 ¶112; Anderson Affidavit, Doc. 39-4 ¶17.

[158] Amended Complaint, Doc. 3 ¶¶50-56; Answer, Doc. 9 ¶¶50-56.

[159] TEAM 008, Doc. 36-38; Amended Complaint, Doc. 3 ¶68; Answer to Amended Complaint, Doc. 9 ¶68.

[160] *Id.*

[161] CSMF ¶111. Team states that it "denies that [it] did not pay for these orders." CSMF ¶111. But Team cites no evidence in support of this fact and the substance of its denial provides a justification for nonpayment, rather than evidence of payment itself. So the fact of nonpayment is admitted for purposes of this motion. Likewise, Team's denials to the fact that Spektar manufactured the materials for invoices 12035 and 12395 and stores them in its warehouse merely rely on its lack of knowledge as to these facts, and they have not created a dispute here either. SMF ¶¶128-129; CSMF ¶¶128-129.

12395 were erroneous.[162] Spektar's March 2023 Invoice reflects that these items were still being stored by Spektar.[163]

## IV.    ANALYSIS

The parties have offered essentially no legal analysis to the Court. Spektar has provided the Court a smattering of authorities peripherally relevant to its motion as to Team's first and second counterclaims[164] and otherwise provided no legal authority for its arguments.[165] For its part, Team provides no legal citations at all.[166] Instead, the parties mainly argue about what genuine disputes of fact exist in the record, and then conclude that summary judgment should be granted or denied. The Court has therefore made its best effort to construe these papers and the legal arguments they attempt to raise; at the same time, the Court has avoided chasing down legal rabbit holes entirely unargued by the parties. Should the Court fail to *sua sponte* identify a legal theory the parties failed to identify themselves, that is no basis for reconsidering the judgment in this case.

---

[162] Anderson Deposition, Doc. 36-30 at 57:3-58:21 (testifying that the entries for 69,000 "JAQ Honeycomb Menudo Limpio" and 39,000 "JAQ Patas de res Cortadas (Beef Feet)" contained misprints).

[163] TEAM 007, Doc. 36-37 ("Floor Stock ordered under multiple Blanket PO#'s and placed into Team Packaging stock – all over 90 days").

[164] Motion for Summary Judgment, Doc. 35 at 24-25 (citing two cases setting out the general standard for breach of contract, one case in which the Third Circuit applied New Jersey courts' interpretations of the U.C.C., and one citation to 13 Pa.C.S. § 2719), 42 (providing one relevant case citation).

[165] Except, of course, for legal authority setting out the summary judgment standard and the opportunity to brief on damages.

[166] Again, except for setting out the summary judgment standard. *See generally* Brief in Opposition, Doc. 37.

### A.    Spektar's    Motion    for    Summary    Judgment    on    Team's Counterclaims

Spektar moves for summary judgment on Team's two counterclaims. The Court denies Spektar's motion as to Team's breach of contract counterclaim for the nonconforming Lahore shipment to Mistica. A reasonable jury could conclude that the installment contained nonconformities substantially impairing the value of the installment, and even assuming that Spektar could have cured the installment's nonconformities, it failed to offer adequate assurance of such a cure. The Court grants Spektar's motion as to Team's breach of contract and warranty counterclaim regarding the Loaner Machine. Team failed to brief in opposition, so it abandoned the counterclaim.

### 1.    Team's    Breach    of    Contract    Counterclaim:    Lahore Shipment to Mistica

As the Court concluded above, a reasonable jury could conclude in favor of the non-movant, Team, that Team never tested or approved the Lahore film for Mistica, and that the entire October 2022 shipment of Lahore film to Mistica had the additional defects of improper labeling and moldy cores. The Court now proceeds to resolve Team's first counterclaim for breach of contract, which is based on the nonconforming Lahore film received by Mistica in October 2022.

The parties do not dispute whether the Purchase Order was breached for purposes of this claim and instead, agreeing that the original shipment was nonconforming, focus on whether Spektar offered adequate assurances to cure its

33

breach under the U.C.C. The parties agree that some of 10-mil rolls contained in this shipment were cut 2mm too narrow, could not run on Mistica's machines, and as such breached the agreement through their nonconformities requiring Spektar to offer some cure. But they disagree about whether any other aspects of the shipment were sufficiently nonconforming to require a cure. As I will explain below, Team has discharged its burden to create a genuine dispute of fact on this issue; a reasonable jury could conclude that Spektar failed to give Team adequate assurance of its cure because it did not offer to replace the entire installment.

Pennsylvania has adopted the Uniform Commercial Code ("U.C.C."), which "involves the sale of goods."[167] "The UCC addresses 'the sad fact that many . . . sales contracts are not fully bargained, not carefully drafted, and not understandingly signed by both parties.'"[168] So too here. The installment contract at issue,[169] Purchase Order No. 1036919, offers little in the way of contract terms, mainly setting out the expected price, quantities, and release dates of six separate shipments of two products: "JAQPA 125 407MM – 609M COOK FILM," the 5-mil film, and "JAQPA 225 432MM – 305M COOK FILM," the 10-mil film.[170] It

---

[167] *Std. Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 444-45 (3d Cir. 2003); 13 Pa.C.S. § 1101 (codifying Pennsylvania's adoption of the U.C.C.).

[168] *Std. Bent Glass Corp.*, 333 F.3d at 444 (quoting 1 James J. White & Robert S. Summers, *Uniform Commercial Code* §§1-3, at 6 (4th ed. 1995)).

[169] Purchase Order No. 1036919 meets the U.C.C.'s definition of an installment contract because it "requires or authorizes the delivery of goods in separate lots to be separately accepted." 13 Pa.C.S. § 2612(a).

[170] TEAM 0007, Doc. 36-37 at 2.

does not specify methods of curing breach. Therefore, the U.C.C.'s gap-filling function supplies relevant terms of this contract.

As codified in Pennsylvania law, the U.C.C. permits the buyer in an installment contract to reject a nonconforming shipment "if the nonconformity substantially impairs the value of that installment and cannot be cured or if the nonconformity is a defect in the required documents."[171] However, "if the nonconformity does not fall within subsection (c) . . . and the seller gives adequate assurance of its cure the buyer must accept that installment."[172] It follows from this text that an effective assurance must assure the buyer that the seller will cure all nonconformities which "substantially impair[] the value of that installment" or which relate to "a defect in the required documents."[173]

According to the U.C.C.'s commentary:

> Substantial impairment of the value of an installment can turn not only on the quality of the goods but also on such factors as time, quantity, assortment, and the like. It must be judged in terms of the normal or specifically known purposes of the contract. The defect in required documents refers to such matters as the absence of insurance documents under a C.I.F. contract, falsity of a bill of lading, or one failing to show shipment within the contract period or to the contract destination.[174]

---

[171] 13 Pa.C.S. § 2612(b).

[172] *Id.* Subsection (c) provides, in relevant part, that "[w]henever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole." 13 Pa.C.S. § 2612(c). A reasonable jury could conclude that this installment substantially impaired the value of the whole contract; nevertheless, the Court explains why Spektar's cure was not adequate for the sake of completeness.

[173] 13 Pa.C.S. § 2612(b).

[174] U.C.C. § 2-612 cmt. 4. When the Pennsylvania legislature codified the U.C.C. into Pennsylvania law, it did not explicitly codify the U.C.C.'s official commentary. The

Also relevant to the U.C.C.'s gap-filling function is 13 Pa.C.S. § 1303. Section 1303 specifies that "the parties' course of performance or dealing, or an applicable usage of trade, "is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement."[175] "A 'course of performance' is a sequence of conduct between the parties to a particular transaction that exists if: (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection."[176] "A 'course of dealing' is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."[177] And, a "'usage of trade is any practice or method of dealing

---

Pennsylvania Superior Court, applying 1 Pa.C.S. § 1939, therefore concluded in *Pavex, Inc. v. York Federal Sav. And Loan Ass'n* that "the [U.C.C.] comment is not part of the legislation and therefore not entitled to binding effect." 716 A.2d 620, 647 n.10 (Pa. Super. Ct. 1998). However, the commentary remains instructive as a persuasive authority expounding the U.C.C.'s meaning, and Pennsylvania courts continue utilizing the commentary for that purpose. *See, e.g.*, *Hanaway v. Parkesburg Grp. L.P.*, 168 A.3d 146, 385 (Pa. 2017). Accordingly, absent tension between Pennsylvania statutory or common law and the U.C.C. commentary, the commentary remains instructive.

[175] 13 Pa.C.S. § 1303.
[176] *Id.* at § 1303(a).
[177] *Id.* at § 1303(b).

having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question."[178]

In this case, because the record reflects that Spektar offered exclusively to replace the 10-mil film, it did not offer adequate assurance of its cure under Section 2612 if the 5-mil film had any nonconformities substantially impairing its value. A reasonable jury could conclude that it did. First, the record reflects that even the 5-mil Lahore rolls had core labels which were missing information; a reasonable jury could construe Pacyniak's testimony that such labeling is a required "food safety protocol" to establish a usage of trade, or at least to reflect the course of dealings between Team and Spektar in previous film shipments.[179] Spektar never offered to cure this "defect in the required documents," substantially impairing the value of the installment by making it noncompliant absent Team or Mistica incurring additional expenses to label the film to satisfy regulatory compliance requirements.[180]

Second, the manufacturer itself is a nonconformity based on this record. An issue of fact exists as to whether the JAQPA product code indicates that products are manufactured by Jayshri. Construed in Team's favor, this fact establishes that in the Purchase Order 1036919 installment contract, Spektar and Team explicitly

---

[178] *Id.* at § 1303(c).
[179] Pacyniak Deposition, Doc. 36-11 at 70:7-71:4.
[180] Other potential nonconformities include the rolls' moldy cores and incorrect web widths and slip levels.

contracted for the sale of Jayshri-manufactured ("JAQPA") film and the shipment was nonconforming.[181] A reasonable jury could also find the nonconformity to be established through the parties' course of performance[182] or trade usage.[183]

The different-manufacturer nonconformity substantially impairs the value of the shipment for two interrelated reasons. First, the issue of mixing film from different manufacturers. Although Spektar mainly argues that the 5-mil film itself lacked the measurement defects of the 10-mil film and was functional, "[t]he test of impairment is not [] a diminution in value of the goods on the open market, or to the average buyer, but rather a substantial impairment of value to the particular buyer involved."[184] As a matter of Mistica's preference and industry standards, mixing and matching top and bottom film from different manufacturers requires

---

[181] *See* U.C.C. § 2-612 cmt. 4 ("One of the requirements for rejection under subsection (2) is non-conformity substantially impairing the value of the installment in question. However, an installment agreement may require accurate conformity in quality as a condition to the right to acceptance if the need for such conformity is made clear either by express provision or by the circumstances. In such a case the effect of the agreement is to define explicitly what amounts to substantial impairment of value impossible to cure. A clause requiring accurate compliance as a condition to the right to acceptance must, however, have some basis in reason, must avoid imposing hardship by surprise and is subject to waiver or displacement by practical construction.").

[182] Team adduced evidence showing that prior film shipments in this Purchase Order installment contract for Mistica had always come from Jayshri.

[183] Team adduced evidence that it is standard in this industry to "send test rolls to the customer first . . . [and] send[] a letter of guarantee regarding the new manufacturer" before switching to a new manufacturer. Mike Anderson Affidavit, Doc. 39-4 ¶16. Indeed, Team and Spektar engaged in this same process for their initial shipments of Jayshri film to Mistica.

[184] *Gasque v. Mooers Motor Car Co.*, 313 S.E.2d 384, 388 (Va. 1984).

the customer to take on additional risks. Requiring Mistica to take on those risks, then, substantially impairs the value of the shipment.[185]

Secondly, the approval issue.[186] One may argue in turn that Spektar's initial replacement offer—which ostensibly would have used Lahore film—would remedy the nonconformity while ensuring that the 10-mil and 5-mil film originated from the same manufacturer. Not so. Because Mistica had not approved Lahore, it had no guarantee as to the quality of Lahore film; and because the only Lahore shipment Mistica has received was in large part nonconforming, a reasonable jury could believe that Lahore replacement film risked similar defects or quality issues. Accepting that replacement, then, required Mistica to deviate from industry custom to take a gamble on the quality of an unknown and unapproved manufacturer; forcing this choice upon Mistica, because of the uncertainty involved, also did not provide adequate assurance that the replacement film would be conforming.[187]

---

[185] Pacyniak's attempts to convince Mistica to mix film from different manufacturers in this circumstance does not remove the risks of doing so.

[186] As described above, a reasonable jury could conclude that the Lahore film was never approved by Team or Mistica and so this dispute of fact is construed in Team's favor for purposes of summary judgment. And to be frank, Spektar's alternative argument—that it secretly sent the Lahore film to Team for testing, without telling Team that it had come from Lahore—is hardly better.

[187] Spektar also did not provide a reasonable assurance of a sufficient cure because it never fulfilled Team's request to "confirm and send [Team] the roll tags showing this as well as pictures showing what the web widths are for both the top and bottom film." Mistica Email Chain, Doc. 39-7 at 5. Because (again, resolving all genuine disputes in the light most favorable to Team) this shipment was fraudulently labeled as originating from Jayshri rather than Lahore, Spektar's assurance was not reasonable under the circumstances until it provided the additional proof requested by Team.

Accordingly, based on the genuine disputes remaining in this case, a reasonable jury could conclude that the entire shipment of Lahore film contained nonconformities substantially impairing the value of this installment. This means that to provide an adequate assurance of a *sufficient* cure, Spektar was required to offer a replacement shipment for the entire installment, namely a replacement shipment originating from Jayshri, which Mistica had tested and approved. This it did not do. Accordingly Spektar's motion must be denied with respect to this counterclaim.[188]

### 2.    Team's Breach of Contract and Warranties Counterclaim: Loaner Machine

In its second counterclaim, Team seeks damages for Spektar's breach of contract or warranty regarding the Loaner Machine's functionality. In its brief in support, Spektar argues that Team failed to provide any documents establishing an underlying contract or warranty and that Team cannot sustain a counterclaim

---

[188] The U.C.C. provides that "after rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller," and a buyer who rightfully rejects goods in his possession "is under a duty after rejection to hold them with reasonable care at the disposition of the seller for a time sufficient to permit the seller to remove them." 13 Pa.C.S. § 2602(b)(1)(2). Where as here the "seller gives no instructions within a reasonable time after notification of rejection the buyer may [1] store the rejected goods for the account of the seller or [2] reship them to him or [3] resell them for the account of the seller with reimbursement." 13 Pa.C.S. § 2604. So Spektar might have further argued that Team breached Purchase Order 1036919 by violating its duty to dispose of the nonconforming film with reasonable care and throwing out most of this first nonconforming installment. The Court would then have to determine whether Team's decision to throw out the film was reasonable under the circumstances. *See* U.C.C. § 2-604 cmt. ("The listing of what the buyer may do in the absence of instructions from the seller is intended to be not exhaustive but merely illustrative."). But Spektar's papers do not fairly raise this issue, even in passing, nor does Spektar sue Team for any damages related to its disposal of the September 12, 2022 installment. Therefore the Court does not pass upon the issue now.

where the Loaner Machine was provided for no cost.[189] But Team never briefs in opposition to Spektar's motion for summary judgment regarding its second counterclaim. Accordingly Team has abandoned this counterclaim[190] and summary judgment will be granted in Spektar's favor.

### B.    Spektar's Motion for Summary Judgment on its Claims

Spektar has also moved for summary judgment as to all counts in its complaint. Summary judgment is granted as to Spektar's breach of contract claim for Team's failure to pay for the TEPRO machine and film specified in the Equipment Purchase Agreement. Team claims that the EPA was contingent on the Loaner Machine's functionality, but there's no textual evidence for that obligation in the EPA itself. Summary judgment is denied as to Spektar's conversion claim for Team's continued possession of the Loaner Machine. Team adduced testimony that it paid Spektar for the Loaner Machine, which is sufficient for Team survive summary judgment. Finally, although Spektar lumps its breach of contract claims for unpaid invoices together, they make up five distinct claims; the Court only

---

[189] Motion for Summary Judgment, Doc. 36 at 37-38. As discussed above, this fact has been resolved in Team's favor for purposes of summary judgment.

[190] *Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F.Supp. 3d 541, 556-57 (M.D. Pa. 2014) ("Courts within the Third Circuit have routinely held that a non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended."); *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("In the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned.").

grants summary judgment as to one of them because Spektar has otherwise failed to create a sufficient record for the Court to grant summary judgment.

### 1.    Spektar's Breach of Contract Claim: Equipment Purchase Agreement

To support its breach of contract claim, Spektar argues that Team's failure to pay for or pick up the TEPRO machine and to pay for film was a breach of the agreement. I agree.

Under Pennsylvania law, a breach of contract claim requires three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."[191] Team argues that it never breached because the EPA was contingent on the Loaner Machine Agreement. Because there is no basis for Team's proposed reading of the EPA, the Court must grant Spektar's motion for summary judgment.

"To ascertain the intent of the parties, a court must first look to the four corners of the document—the express language of the contract."[192] "[W]here the parties to an agreement adopt a writing as the final and complete expression of their agreement, alleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically covered by the written contract are merged in or superseded by that contract."[193] Indeed, "[o]nce a writing

---

[191] *Williams v. Nationwide Mut. Ins. Co.*, 723 A.2d 881, 884 (Pa. Super. Ct. 2000).
[192] *PBS Coal, Inc. v. Hardhat Mining, Inc.*, 632 A.2d 903, 905 (1993).
[193] *Youndt v. First Nat'l Bank*, 868 A.2d 539, 546 (Pa. Super. 2005).

is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previously oral or written negotiations or agreements involving the same subject matters as the contract is almost always inadmissible to explain or vary the terms of the contract."[194] The only exception is where the contract is "ambiguous" due to being "reasonably susceptible of different constructions and capable of being understood in more than one sense."[195] "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact."[196]

Applying these principles to the EPA is straightforward. The EPA does lay out the general film-upcharge payment regime discussed by the parties, which apparently would have been aided through the Loaner Machine. It obliquely references the existence of the Loaner Machine by appending an email stating that Colorado Food Enterprises would be "doubling their film usage with a second machine and this [the TEPRO] may be paid off sooner."[197] The EPA never goes beyond this and says nothing about the Loaner Machine itself or whether it should

---

[194] *Id.*

[195] *Mun. Auth. of Midland v. Ohioville Borough Mun. Auth.*, 108 A.3d 132, 139 (Pa. Commw. Ct. 2015) (citing *Sun Co. (R&M) v. Pa. Turnpike Comm'n*, 708 A.2d 875, 878 (Pa. Commw. Ct. 1998)).

[196] *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) (citing *Cmty. Coll. v. Soc'y of the Faculty*, 375 A.2d 1267, 1275 (Pa. 1977)).

[197] This language is provided in the email excerpt which appears to have been attached, without context, to the last page of the Equipment Purchase Agreement. TEAM 0011, Doc. 36-41 at 15.

work. Moreover, the EPA contains a merger clause which states that is a complete agreement constituting the entire understanding of the parties.[198]

Team's principal argument appears to relate to the doctrine of necessary implication. "It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure."[199] "Accordingly, a promise to do an act necessary to carry out the contract must be implied."[200] Team's argument seems to be, then, that under the EPA's upcharge payment scheme, there was no way to collect the funds to pay for the TEPRO if the Loaner Machine did not work.[201]

Not so. First—though the facts are hazy on this record—it is at least clear that Colorado Food Enterprises had another machine aside from the dysfunctional Loaner Machine, and was able to use Spektar's film with it.[202] Second, it is worth

---

[198] TEAM 0011, Doc. 36-41 at 5, ¶12.10 ("Entire Agreement. This agreement, along with the Exhibits to this Agreement, constitute the entire understanding of the parties related to the subject matter hereof, and supersedes and replaced any and all prior or contemporaneous discussions, negotiations, understandings and agreements, written or oral, regarding such subject matter. This Agreement may only be amended or modified in writing signed by authorized representatives of each party.").

[199] *Hood v. Heininger*, 105 A.2d 126 (1954); *see also* 1 Corbin on Pennsylvania Contracts § 53.02 (referring to this as the "doctrine of necessary implication").

[200] *Daniel B. Van Campen Corp. v. Building & Constr. Trades Council*, 185 A.2d 134, 137 (Pa. Super. Ct. 1963) (quoting 8 P.L.E. Contracts § 140).

[201] Team makes no attempt to justify its argument with legal authority or propositions—this is the Court's best guess at why Team brings up these facts in its briefing.

[202] In the Team email appended to the last page of the EPA, Anderson implies that Colorado Food Enterprises will be using two machines: "The one benefit here is…they will be doubling their film usage *with a second machine* and this may be paid off sooner." TEAM 0011, Doc. 36-41 at 15 (emphasis added). It is not clear whether this refers to the second

reiterating that the EPA draws no connection between it and the Loaner Machine's functionality. Rather than implying that the film upcharge raised from the broken Loaner Machine was the exclusive method of payment for the TEPRO machine, the EPA explicitly provides the opposite: Colorado Food Enterprises shall provide a monthly machine payment of $4,529.00 if it does not generate that sum through the upcharged film payment regime.  "And a court 'may apply the doctrine of necessary implication . . . in only limited circumstances; it may imply a missing term in a parties' contract only when it is necessary to prevent injustice *and it is abundantly clear that the parties intended to be bound by such term*.'"[203] Accordingly, the film upcharge payment regime set out in the EPA does not, by necessary implication, require Spektar to provide Colorado Food Enterprises a working Loaner Machine for Team to be bound.

Team's second argument is that it was not bound because it had not issued a Purchase Order for the TEPRO machine described in the EPA.[204] Team notes that the EPA states that "within ten (10) days of the Effective Date, Purchaser shall submit a material order under (Blanket PO) purchase order for enough material to

---

machine Spektar proposed offering in Wildonger's original email, or a second machine Colorado Food Enterprises' possession. *See* TEAM 0012, Doc. 36-42 (email originally proposing the Loaner Machine agreement, which states that Colorado Food Enterprises will receive two loaner machines, an R140 for a cost of $30,000 and the disputed R230).

[203] *Cessna v. REA Energy Coop., Inc.*, 258 F.Supp. 3d 566, 590-91 (W.D. Pa. 2017) (quoting *Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 720 (Pa. Super. Ct. 1996)).

[204] Brief in Opposition, Doc. 38 at 12.

cover 90 days of projected production."[205] This appears to be a contract formation argument, or perhaps an argument based on course of dealings; it fails. The EPA itself sets out an effective Date of June 22, 2021, and satisfies the basic requirements of offer, acceptance, and consideration.[206] There is no reason to conclude, based on the text of the EPA or any other principle of contract law, that Team was not contractually bound until it issued the Purchase Order specified in the EPA.[207] If anything, the failure to issue this Purchase Order is itself an additional breach of the EPA by Team.

In sum, there is no textual source within the EPA to suggest that any of its terms were contingent upon the functionality of the Loaner Machine, or even to create any source of ambiguity on this question.[208] "Since the relevant provisions in these documents are clear and unambiguous, the testimony about the parties' intentions when entering into these agreements is irrelevant to our analysis."[209]

---

[205] TEAM 0011, Doc. 36-41 at 8.

[206] *Id.* at 1 (setting out EPA's effective date).

[207] To the extent Team meant to appeal to a course of dealings between it and Spektar regarding Purchase Orders, that appeal fails. 13 Pa.C.S. § 1303(e) ("express terms prevail over course of performance, course of dealing and usage of trade"); *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982) ("When a written contract is clear and unequivocal, its meaning must be determined by its contents alone . . . . there is no need to resort to extrinsic aids or evidence.").

[208] Team's attempt to allege that the EPA was contingent on the Loaner Agreement in its counter-statement of facts, aside from being conclusory, also lacked any citation to competent record evidence. CSMF, Doc. 38 ¶94 (citing an allegation in Team's answer at Exhibit 5, Doc. 39-5 ¶84). *See Webb v. Columbia Cnty.*, No. 4:22-CV-00292, 2023 U.S. Dist. LEXIS 230328, at *4 (M.D. Pa. Dec. 27, 2023) (parties may not rely on their own pleadings at summary judgment).

[209] *Market Square Props. Dev., LLC v. TGRG, LLP*, 257 A.3d 716, 718 n.4 (Pa. Super. Ct. 2021).

Team therefore breached the EPA by failing to pick up or pay for the TEPRO machine and corresponding rolls of film, and Spektar is entitled to summary judgment.

A final note. The EPA imposed obligations on Team to arrange for the purchase of the TEPRO machine and 90 days of film from Spektar. Team mainly focuses on the former contract obligation. Regarding the latter, the Court observes that Team offers no arguments that any film provided to Colorado Food Enterprises was nonconforming or defective, nor did it otherwise attempt to offer a defense releasing it from this contractual obligation. Accordingly, the Court does not address any such argument here.

### 2.    Spektar's Conversion Claim: Loaner Machine

Spektar brings a conversion claim based upon Team's retention of the Loaner Machine. Conversion is "the deprivation of another's right of property in, or use or possession of, chattel, or other interference therewith, without the owner's consent and without lawful justification."[210] "Specific intent is not required, however, but rather an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's right establishes the tort."[211]

As developed above, Team has created a genuine dispute of fact as to whether Spektar transferred possession of the Loaner Machine because Anderson

---

[210] *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964).

[211] *Shonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. Ct. 1987) (citing *Stevenson*, 197 A.2d at 726).

states in his deposition and affidavit that after Team had the machine repaired, Wildonger sold it to Team for $8,000, which Team paid.[212] Property is not converted where title is willingly transferred through sale.[213] So Spektar's motion for summary judgment on its conversion claim is denied.

### 3.  Spektar's Breach of Contract and Unjust Enrichment Claims: Unpaid Invoices for Film

Spektar argues that Team is liable for additional breach of contract and unjust enrichment claims by failing to pay five separate invoices.[214] Though inartfully pled as one breach of contract claim, Spektar actually brings five distinct breach of contract claims, which I must analyze separately.

As the Court set out above, under Pennsylvania law, a breach of contract claim requires three elements: "(1) the existence of a contract, including its

---

[212]  Anderson Deposition, Doc. 36-30 at 18:20-19:1, 80:1-22, 99:3-8, 101:13-16; Anderson Affidavit, Doc. 38-4 ¶21. Spektar contends that it did not sell the Loaner Machine to Team and that Team never paid the $8,000 invoice, but that is an issue to be resolved by the fact-finder. And because Spektar did not raise the sham affidavit doctrine the Court does not *sua sponte* apply it here.

[213]  *See Whitfield v. U.S.*, 92 U.S. 165, 170 (1875) ("A sale of personal property, when completed, transfers to the purchaser the title of the property sold."). The unjust enrichment claim is unsuccessful for the same reasons.

[214]  Spektar could have brought a breach of contract claim as to Team's refusal to purchase the remaining, unmanufactured film as set out in the Purchase Order 1036919 Installment Contract. But despite perhaps hinting at such a claim, Spektar does not appear to have raised it. Count I of Spektar's complaint states: "Breach of Contract: Unpaid Invoices 11734, 11735, 12035, 12089 and 12395." Amended Complaint, Doc. 3 at 12. And, Spektar's Brief in Support requests relief for unpaid invoices, while noting that "the remaining non-manufactured rolls under PO 1036919 were not invoiced." Brief in Support, Doc. 35 at 45. Accordingly the Court understands Spektar to only seek relief for the Purchase Order installments relating to unpaid invoices, *not* to Purchase Order installments which were never invoiced. If Spektar did intend to raise a broader breach of contract claim for the entirety of the Purchase Order, it has forfeited that argument by failing to provide sufficient clarity in its papers.

essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."[215]

An unjust enrichment claim must show "[1] benefits conferred on defendant by plaintiff, [2] appreciation of such benefits by defendant, and [3] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."[216] "[T]he doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract."[217] Rather, "[w]here unjust enrichment is found, the law *implies* a contract . . . which requires that the defendant pay to plaintiff the value of the benefit conferred. In short, the defendant makes restitution to the plaintiff in *quantum meruit*."[218] It is "typical" for unjust enrichment claims to provide recovery "from a defendant for a benefit conferred under an unconsummated or void contract."[219]

Summary judgment is denied as to Invoice Nos. 11734 and 11735 because Spektar failed to introduce any evidence about corresponding Purchase Order 1035183 or its terms. Summary judgment is also denied as to Invoice No. 12035. A reasonable jury could conclude that the defective prior installment of Lahore-

---

[215] *Williams v. Nationwide Mut. Ins. Co.*, 723 A.2d 881, 884 (Pa. Super. Ct. 2000).

[216] *Lackner v. Glossner*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) (quotation omitted).

[217] *Wilson v. Parker*, 227 A.3d 343, 353 (Pa. Super. Ct. 2020) (quoting *Shafer Elec. & Const. v. Mantia*, 67 A.3d 8, 13 (Pa. Super. Ct. 2013)).

[218] *Schenk v. K.E. David, Ltd.*, 666 A.3d 327, 328-29 (Pa. Super. Ct. 1995) (emphasis added).

[219] *Boring v. Google Inc.*, 362 F.App'x 273, 281 (3d Cir. 2010).

manufactured film substantially impaired the value of the whole installment contract set out in Purchase Order 1036919, providing Team with the right to cancel the contract. Further, construing all genuine disputes in Team's favor, a reasonable juror could conclude that Spektar retained executory obligations relating to shipping.

Summary judgment is granted, however, with respect to Invoice No. 12089. Team admits that it agreed to purchase the corresponding items in Purchase Order 1037600, and the undisputed record shows that Team received these goods but never paid for them.

Summary judgment is denied as to Invoice No. 12395. Spektar failed to create a clear record showing which specific purchase orders obligated Team to pay for these goods, so it cannot obtain summary judgment on the corresponding breach of contract claims. Finally, where the Court has granted Spektar summary judgment for breach of contract, it cannot grant summary judgment for unjust enrichment with respect to the same obligations; for any remaining unjust enrichment claims, Spektar has not created an undisputed record showing that Team received any benefit under inequitable circumstances.

### a.    Invoice Nos. 11734 and 11735: Shipping for P.O. 1035183

The parties agree that Invoice Nos. 11734 and 11735 bill Team for shipment costs relating to Purchase Order 1035183 and that Team did not pay them. Spektar

failed to provide this Purchase Order or explain why it requires Team to pay for shipping costs and Team has not so admitted. "In an action for breach of contract, establishing the existence of an agreement and its essential terms is the first element."[220] "It is hornbook law that in order to form a contract, there must be an offer, an acceptance, and consideration."[221] An invoice merely requests payment—it is not itself a contract.[222] Provided with only Invoice Nos. 11734 and 11735, a reasonable jury could conclude that Spektar has failed to establish that Purchase Order 1035183 required Team to pay these shipping costs; it is equally possible that the underlying Purchase Order included shipping costs which would be paid by Spektar.[223] For the same reason, Spektar's related unjust enrichment claim also fails at summary judgment.

### b.    Invoice No. 12035: The Second Installment of P.O. 1036919

As the Court detailed at length above, the first installment of Purchase Order 1036919 was a shipment of Lahore-manufactured film to Mistica which originally ignited this dispute. Invoice No. 12035, which was issued on September 28, 2022, is for the subsequent installment of film to Mistica under Purchase Order 1036919.

---

[220] *Hish v. Pelsynski*¸ 249 A.3d 1153 (Pa. Super. Ct. 2021) (Table decision).

[221] *Yoder v. Am. Travellers Life Ins. Co.*, 814 A.2d 229, 233 (Pa. Super. Ct. 2002).

[222] *See Pa. R. Co. v. Stern*, 12 A. 756, 758 (Pa. 1888) ("The invoice, standing alone, furnishes no proof of title.").

[223] Likewise, to apply the U.C.C.'s gap-filling function to missing contract terms at summary judgment, Spektar would be required to show that the underlying agreement did not contain a contract term specifying whether Team was to pay for these shipping costs. This it has not done.

Team admits that it placed the underlying Purchase Order and refused to pay for it, and the Purchase Order matches the products listed on Invoice No. 12035, establishing the elements for a breach of contract claim. The Court now considers whether any defense to Team's breach precludes summary judgment.

### i.    Team's Right to Cancellation of P.O. 1036919

Team's main defense is that it was not obliged to pay for nonconforming shipments manufactured by Lahore rather than Jayshri. But Team's citations do not provide any record evidence to show that this second installment was nonconforming. Rather, even read in the light most favorable to Team, the record shows that Team *inferred* that the subsequent installments would be nonconforming because of Spektar's conduct, namely Spektar's refusal to cure the prior installment's different-manufacturer nonconformity by replacing the whole shipment of Lahore film with Jayshri film.[224] Team could be making two arguments premised on the counterfeit nature of the prior Purchase Order 1036919 installment: Team was justified in cancelling the whole contract, or Spektar itself

---

[224] In its brief in opposition Team claims that "Spektar refused to confirm that any replacement film – or any subsequently shipped film – would be authentic, Jayshri film." Brief in Opposition, Doc. 38 at 17. Indeed, Team did ask Spektar for assurances that the disputed, first installment conformed to the contract. *See* Mistica Email Chain, Doc. 39-7. But Team cites to no source showing that Team asked Spektar for assurances that *future* shipments would conform, i.e., would be manufactured by Jayshri rather than Lahore.

repudiated this term of the contract. Ultimately, the Court denies summary judgment based upon the former theory and declines to reach the latter.[225]

The U.C.C. as codified in Pennsylvania law provides that "[w]henever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole,"[226] in which case the buyer may cancel the contract.[227] "Whether the non-conformity in any given installment justifies cancellation as to the future depends, not on whether such non-conformity indicates an intent or likelihood that the future deliveries will

---

[225] An argument that Spektar anticipatorily repudiated the remainder of the installment contract, with respect to the source of manufacturer for the film, might be on shakier ground. Here Spektar arguably repudiated any obligation to provide Jayshri film under the prior installment but made no such repudiation with respect to future installments, despite Team's protests to the contrary. Pennsylvania contract law is quite strict as to what qualifies as a repudiation of a contract—"anticipatory repudiation or breach requires 'an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so.'" *Andrews v. Cross Atl. Capital Partners, Inc.*, 158 A.3d 123, 130 (2017) (quoting *Harrison v. Cabot Oil & Gas Corp.*, 110 A.3d 178, 184 (2015)). *See also Edwards v. Wyatt*, 335 F.3d 261, 272 n.8 (3d Cir. 2003) ("[T]he Pennsylvania Supreme Court has emphasized that Pennsylvania contract law imposes stricter requirements than does the Restatement for an anticipatory repudiation defense."). In contrast, the U.C.C. commentary appears to suggest a more forgiving standard for what qualifies as repudiation. U.C.C. § 2-610 cmt. 2 ("Repudiation can result from action which reasonably indicates a rejection of the continuing obligation . . . when under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation."). Although the U.C.C. displaces inconsistent common law principles, *see* 13 Pa.C.S. § 1103, it is equally true that Pennsylvania never explicitly adopted the U.C.C. *commentary*, which is what provides the more forgiving anticipatory repudiation standard here. *See supra*, n. 175. Rather than resolve the applicable standard here, the Court rests upon the other theory regarding Team's justified cancellation of the contract.

[226] 13 Pa.C.S. § 2612(c). *See also BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 981 F.3d 618, 629 (7th Cir. 2020) (Stating that "[a]fter a seller repudiates . . . by failing to give adequate assurances" that it will cure an installment containing nonconformities substantially impairing its value, the U.C.C. "provides that the buyer may cancel . . . 'if the breach goes to the whole contract.'").

[227] 13 Pa.C.S. § 2711(a) (setting out buyer's cancellation remedy).

also be defective, but whether the non-conformity substantially impairs the value of the whole contract."[228] As I set out above, the substantial impairment inquiry "can turn not only on the quality of the goods, but also on such factors such as time, quantity, assortment, and the like," and "must be judged in terms of the normal or specifically known purposes of the contract."[229]

It has therefore been said that "a showing of substantial impairment of the value of the whole contract requires more than a mere showing of material breach of one or more installments."[230] Nevertheless, one breaching installment may be sufficient to substantially impair the value of the whole contract, depending on the facts of the case. In *Jeddo Coal Co. v. Rio Tinto Procurement (Sing.) PTE Ltd.*, for example, my colleague, the Honorable Robert D. Mariani, denied a motion to dismiss a breach of contract claim for an installment contract where the failure to pay for one installment represented 14.7% (one-seventh) of the installment contract's overall value, acknowledging the fact-specific nature of the inquiry and determining that granting a motion to dismiss would be premature.[231] Other courts have likewise found "concrete examples from a variety of contexts where contractual parties have breached their entire contract through improper

---

[228] U.C.C. § 2-612 cmt. 6.

[229] U.C.C. § 2-612 cmt. 4.

[230] *Bayer Corp.*, 214 S.W. 3d at 599 n.12.

[231] No. 3:16-cv-621, 2017 U.S. Dist. LEXIS 34007, at * (M.D. Pa. 2017) (concluding that a breach of contract claim alleging the failure to pay for an installment representing 14.7% of the installment contract's overall value was, due to the fact-specific nature of this question, sufficient to survive a motion to dismiss)

performance of individual installments."[232] "[G]iven the subjective nature of this issue" of whether nonconformity substantially impairs the value of a whole contract, "it is typically regarded as an issue of fact for the jury."[233]

As described above, Spektar refused to offer Team reasonable assurances of its cure for the nonconforming Lahore shipment to Mistica because it did not offer to replace the entire shipment with conforming Jayshri film, and it did not offer to provide Team with the requested confirmation showing that replacement film would be Jayshri-manufactured. Because this custom-manufactured film was rejected by the client and was produced by an unapproved manufacturer, the practical effect was arguably to make the installment unusable,[234] or in other

---

[232] *Exim Brickell, LLC v.* Bariven, No. 09-cv-20915-GOLD, 2011 U.S. Dist. LEXIS 174563, at *62 (S.D. Fla. Aug. 16, 2011) (collecting cases). *See, e.g.*, *Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.*, 965 F.Supp. 1003, 1016 (W.D. Mich. 1997) (based on the facts of the case, substantial nonconformities in one of four installments justified cancellation of the entire contract); *United States Use of Whitaker's, Inc. v. C.B.C. Enters.*, 820 F.Supp. 242, 246 (E.D. Va. 1993) ("Given that the [seller's] first installment of cabinets were clearly nonconforming and could not be cured in the field, [buyer] was entitled to reject all nineteen (19) units."); *Design Plus Store Fixtures, Inc. v. Citro Corp.*, 508 S.E.2d 825, 830 (N.C. Ct. App. 1998) (permitting buyer to cancel contract where first installments of tables "were impossible to assemble," "not usable," and delivered late).

[233] *Bayer Corp. v. DX Terminal, Ltd.*, 214 S.W.3d 586, 595 (Tex. Ct. App. 2006) (applying Pennsylvania law); *Cassidy Podell Lynch, Inc. v. Snydergeneral Corp.*, 944 F.2d 1131, 1148 (3d Cir. 1991); *Exim Brickell, LLC*, 2011 U.S. Dist. LEXIS 174564, at *61 ("Courts from across the country uniformly agree that whether a party to an installment contract has substantially impaired the value of that entire agreement presents a question of fact.").

[234] This, of course, assumes that we resolve all genuine disputes of material fact in Team's favor, including: that Pacyniak's attempts to coax Mistica into using the 5-mil film did not prove that it was usable; that Pacyniak's Mistica email chain potentially arranging the shipment of P1154 film did not relate to the Lahore 5-mil film at issue in this installment; and that Anderson's testimony that the 5-mil film at issue was never taken back or reworked is credible.

words, to deprive the Purchase Order contract of one-sixth of its value.[235] The nonconformity further impaired the shipment's value to Team because it impacted Team's relationship with Mistica, and thus had a "substantial negative impact" on Team beyond the one-sixth diminishment of the Purchase Order's value.[236] Although Team did not immediately lose its account with Mistica, the impact of this nonconforming installment on Team's Mistica account is also an issue best weighed by the factfinder.

Accordingly, construing the record in the light most favorable to Team, a reasonable jury could conclude that this breach substantially impaired the overall value of the Purchase Order contract, entitling Team to cancel the Purchase Order contract, which it did by explicitly instructing Spektar that it would henceforth withhold all payments to Spektar.

### ii.    Legal Effect of Team's Cancellation

Because a reasonable jury could conclude that Team justifiably cancelled the installment contract on January 18, 2023, Team can defeat Spektar's motion for

---

[235] *See, e.g.*, *Jeddo Coal Co. v. Rio Tino Procurement (Sing.) PTE Ltd.*, No. 3:16-cv-621, 2017 U.S. Dist. LEXIS 34007, at * (M.D. Pa. 2017) (concluding that a breach of contract claim alleging the failure to pay for an installment representing 14.7% of the installment contract's overall value was, due to the fact-specific nature of this question, sufficient to survive a motion to dismiss).

[236] *See Midwest Mobile Diagnostic Imaging, L.L.C.*, 965 F.Supp. at 1016 ("[I]mpairment of one of the four installments would have a substantial negative impact" because "one of the primary purposes of this contract was to" allow plaintiff to "meet the growing demand for its services;" plaintiff was justified in canceling the entire contract.).

summary judgment on its breach of contract claim by demonstrating that its cancellation relieved it of the duty to pay Invoice No. 12035.

The U.C.C.'s commentary states that the buyer's remedies for breach, including the remedy of cancellation, should "be liberally administered."[237] "'Cancellation' occurs when either party puts an end to the contract for breach by the other."[238] When a contract is either cancelled or terminated, "all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives."[239] An "executory" obligation is one "[t]o be performed at a future time" or "yet to be completed."[240] In *Mextel, Inc. v. Air-Shields, Inc.*, the Eastern District of Pennsylvania applied this rule to goods which had already been manufactured but had not yet been shipped.[241] *Mextel* involved an installment contract with nonconforming installments which was terminated through the contract's termination provision and, as in this case, the seller brought a breach of contract action for the buyer's failure to pay for a manufactured, yet undelivered, shipment.[242] The *Mextel* court concluded that the obligation to pay for a manufactured yet undelivered shipment was executory in nature because "[u]nder

---

[237] U.C.C. § 2-711 cmt. 3.

[238] 13 Pa.C.S. § 2106(d).

[239] 13 Pa.C.S. 2106(c)-(d).

[240] *Executory*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[241] CIVIL ACTION 01-CV-7308, 2005 U.S. Dist. LEXIS 8632, at *4 (E.D. Pa. Apr. 20, 2005).

[242] The same U.C.C. cancellation argument arose in *Mextel* as well, but it was rendered obsolete because the buyer renewed the contract by continuing to accept and demand shipments. *Id.* at *5; *Mextel v. Air Shields, Inc.*, CIVIL ACTION 01-CV-7308, 2005 U.S. Dist. LEXIS 1281, at *69-79 (E.D. Pa. Jan. 31, 2005).

the agreement, [defendant's] obligation to pay [Plaintiff] for ordered controllers did not arise until after the date of shipment of the controllers;" accordingly, the buyer was not obligated to pay for the manufactured yet undelivered controllers.[243]

In this case, unlike in *Mextel*, the Purchase Order never explicitly spells out that Spektar owed remaining duties. But the parties' course of dealing and course of performance could be understood to imply it.[244] The parties agree that throughout Spektar and Team's course of dealing, Spektar's performance did not cease once it had manufactured and stored a shipment of Team's inventory. Rather, beginning in the second quarter of 2021 when Team began purchasing rolls of film for resale to Mistica, the parties worked jointly to arrange for shipment to Mistica or to Team directly.[245] This established relationship continued regarding the course of performance for the Purchase Order 1036919 installment contract, in which the prior disputed nonconforming film shipment was shipped directly to Mistica by Spektar. It further seems likely that Spektar retained some duties based on the fact that this installment remains in Spektar's inventory. Accordingly, a reasonable jury could conclude that Spektar retained executory obligations with respect to the shipment of products listed in Invoice No. 12035, and therefore conclude that

---

[243] *Id.*

[244] *See* 13 Pa.C.S. § 1303(a)-(b).

[245] SMF, Doc. 36 ¶¶51 ("In the second quarter of 2021, Team began purchasing rolls of film for resale to Mistica . . . .), 54 ("The parties would then arrange for a truck to pick up the material and ship it to either Team or directly to Team's customer, Mistica."); CSMF, Doc. 38 ¶¶51, 54.

Team's cancellation of the installment contract released it from the obligation of paying for these products.[246] The motion for summary judgment is therefore denied.

### c.    Invoice No. 12089: P.O. 1037600

There is no dispute of fact that Team took delivery of the items set out in Invoice No. 12089, that it issued a Purchase Order requesting these items,[247] and that it never paid for them. Moreover, Team has failed to muster any record evidence showing that it knew of a nonconformity in this shipment in rejecting the shipment.[248] This is sufficient to grant summary judgment on Spektar's breach of contract claim.

However, because Spektar has been granted summary judgment on a breach of contract claim relating to this invoice, and because Spektar has not adduced record evidence that any of the products delivered to Team were not specified in

---

[246] This is another scenario in which Spektar *might* have prevailed had it built a clearer record, in this case by clarifying the shipment-related obligations which are only vaguely hinted at throughout the materials cited by the parties.

[247] For whatever reason, not only have both parties failed to provide this Purchase Order, but they have also failed to provide any evidence as to the quantity of these goods requested therein. Regardless, for purposes of determining liability, it is sufficient that even one unit of each product was requested; Spektar has *just barely* managed to prevail here.

[248] As the Court observed earlier, even construed in the light most favorable to Team, the record shows that Team likely *inferred* that future shipments of film from Spektar were manufactured by Lahore. This certainly entitled Team to demand reasonable assurances of conformity, *see* 13 Pa.C.S. § 2609, but Team never requested them. And, it certainly does *not* amount to Spektar's anticipatory repudiation of this obligation in a completely different contract.

the underlying contract, summary judgment must be denied with respect to the unjust enrichment claim.[249]

### d.    Invoice No. 12395: Multiple Blanket P.O.s

The resolution of this breach of contract claim turns on Spektar's failure to create an adequate record for purposes of summary judgment. Invoice No. 12395 is an invoice for all the Team inventory remaining in Spektar's possession which was billed in April 2023. Spektar provides this blanket invoice but never sets out the underlying Purchase Orders requesting the products or shows that Team failed to pay them.[250] And as the Court stated above, an invoice is simply not a contract. In its counter-statement of facts, Team "admits that [it] placed Purchase Orders resulting in . . . [this] invoice."[251] This is a rather opaque admission, and for purposes of summary judgment, it is not clear enough to show that underlying purchase orders were placed for the same goods, and quantities of goods, set out in Invoice No. 12395. Just because the invoice "resulted from" underlying Purchase Orders does not mean that it accurately requests payment for those Purchase

---

[249]  *Wilson*, 227 A.3d at 353 (quoting *Shafer Elec. & Const.*, 67 A.3d at 13) ("[T]he doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract."). To prevail, Spektar would at minimum have to show that it delivered some inventory to Team which was not requested in the underlying contract, that Team received this inventory, and that it retained it under inequitable circumstances.

[250]  Spektar did elicit some testimony from Anderson about whether some of these products contained misprints, which shows that at least some of them are delivered. Anderson Deposition, Doc. 36-30 at 57:3-58:21. In addition to limiting the delivered products to those which were arguably defective, this does not cure the contract issues.

[251]  CSMF, Doc. 28 ¶111.

Orders. Although this is a rather technical basis to deny summary judgment—and one might say it is reasonable to presume what Team implied through its admission—the fault is Spektar's for failing to create the record necessary to obtain summary judgment on this claim, either by providing the underlying contracts or otherwise drawing the connection between Invoice No. 12395 and the preceding purchase orders.

For similar reasons, the Court must deny the motion as to Spektar's unjust enrichment claim. It could likewise be true that the underlying Purchase Orders precisely align with the product types and quantities listed in the Invoice, which would make this a pure breach of contract claim and scuttle any unjust enrichment claim. A second issue is that the Invoice states that the items were still being stored by Spektar, so there is a genuine dispute of fact as to whether Team received the goods listed on the invoice, or if so, how many of them were received.[252] A reasonable jury could therefore conclude that Team was conferred no benefit with respect to this invoice.

---

[252] Anderson stated in his deposition that he believed some of the items contained misprint errors—which implies that they *were* received—but he admits he could not completely recall what aspects were nonconforming with more specificity. Anderson Deposition, Doc. 36-30 at 57:3-58:21. It is therefore unclear from the record if Team received any of these goods, how many of them were received, and how many of them were nonconforming if any at all were shipped to Team. The record is simply too opaque and vague to find that Spektar is entitled to judgment as a matter of law, either for breach of contract or unjust enrichment, based on invoice No. 12395.

## V.    CONCLUSION

Having made its best effort to resolve this motion based upon the parties' papers, the Court concludes that disputes of fact preclude granting summary judgment on some—but not all—of the claims and counterclaims in this case. The Court denies summary judgment for Team's first counterclaim regarding the shipment of nonconforming Lahore film but grants summary judgment for Team's second counterclaim regarding breach of contract or warranties for the Loaner Machine. The Court also grants summary judgment in Spektar's favor for its first claim regarding Team's breach of the EPA but denies summary judgment for Spektar's second claim regarding Team's conversion of the Loaner Machine.

The Court grants summary judgment in Spektar's favor regarding its breach of contract claim for unpaid Invoice No. 12089 (relating to Purchase Order 1037600) and denies summary judgment for all unjust enrichment claims, as well as all claims based upon Invoice Nos. 11734 and 11735 (shipping costs for Purchase Order 1035183), 12035 (purchase price of the second installment of Purchase Order 1036919), and 12395 (blanket Purchase Order billing Team for all remaining inventory).

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge